**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FFF ENTERPRISES, INC., | Civil Action No. 23-20837 (RK) (JTQ) |
| Plaintiff, | |
| v. | **OPINION** |
| RISING PHARMA HOLDINGS, INC., | |
| Defendant. | |

### KIRSCH, District Judge

**THIS MATTER** comes before the Court upon Defendant Rising Pharma Holdings, Inc.'s ("Defendant") Motion for Judgment on the Pleadings, (ECF No. 31, 31-1 ("Open. Br.")), and Plaintiff FFF Enterprises, Inc.'s ("Plaintiff") Cross-Motion for Leave to File a Second Amended Complaint, (ECF No. 33). Plaintiff filed a brief in opposition to Defendant's Motion, (ECF No. 33-1 ("Oppo. Br.")), and Defendant replied, (ECF No. 36 ("Reply Br.")). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion for Judgment on the Pleadings is **GRANTED** in part and **DENIED** in part, and Plaintiff's Cross-Motion for Leave to File a Second Amended Complaint is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

The Court recites the factual background of this case as alleged in Plaintiff's Proposed Second Amended Complaint and its attachments. [1] (*See generally* ECF No. 33-2 ("PSAC")).

---

[1] The Court cites to the Proposed Second Amended Complaint rather than the First Amended Complaint because the Court will "base its analysis on the facts as alleged in Plaintiff's [Proposed Second Amended

### A. COMPOUND CHLOROQUINE AND THE COVID-19 PANDEMIC

Plaintiff is a drug supplier to more than 200,000 customers that include "pharmacies, hospitals and government sponsored healthcare providers and agencies." (PSAC ¶¶ 9, 11.) Plaintiff's sales of drug products to its customers total nearly three billion dollars annually. (*Id.* ¶ 8.) In March 2020, the onset of the COVID-19 pandemic generated intense interest in medical therapies that could treat COVID-19. (*Id.* ¶ 19.) One pharmaceutical compound, compound chloroquine, gained early attention as a potential treatment option. (*Id.* ¶¶ 21–22.) At the time, however, very few drug manufacturers manufactured compound chloroquine. (*Id.* ¶ 25.)

Defendant was licensed to manufacture two drugs with chloroquine in their formulas: hydroxychloroquine and chloroquine phosphate.[2] (*Id.* ¶¶ 22, 26.) Plaintiff sought to supply hydroxychloroquine and chloroquine phosphate to meet growing customer demands.[3] Consequently, given that Defendant was licensed to manufacture the drug products Plaintiff sought to supply to its own customers, Plaintiff and Defendant discussed entering into an agreement whereby Plaintiff would purchase hydroxychloroquine and chloroquine phosphate from Defendant to resell to its own "healthcare providing customers."[4] (*Id.* ¶ 33.)

_____

Complaint] in order to simultaneously determine whether Defendant is entitled to judgment on the pleadings and whether Plaintiff's proposed amendments would be futile." *Cherry Hill Partners at Vill. Place, L.L.C. v. Wachovia Bank, Nat. Ass'n*, No. 10-4770, 2011 WL 2610171, at *1 n.1 (D.N.J. June 30, 2011).

[2] Defendant is a Delaware-incorporated drug manufacturer with a principal place of business in New Jersey. (PSAC ¶ 2.)

[3] Plaintiff is a California-incorporated drug supplier with a principal place of business in California. (PSAC ¶ 1.)

[4] The Court notes that while Plaintiff is referred to in the Proposed Second Amended Complaint as a "*distributor* of human blood products, vaccines and critical-care biopharmaceutical products," (PSAC ¶ 8 (emphasis added)), it appears that Plaintiff did more than simply distribute products on behalf of a manufacturer to the manufacturer's customers. Rather, Plaintiff appears to be in the business of reselling manufacturers' drug products to Plaintiff's own direct customers. (*See* PSAC ¶¶ 17, 88.) Indeed, Plaintiff and Defendant's agreement at issue in the instant matter contemplated that Plaintiff would "exercise commercially reasonable efforts to maintain sufficient inventory on-hand and on-order to meet the needs of *[Plaintiff]'s customers . . .*" (PSAC at Ex. B to Ex. 1 (emphasis added).)

### B. SPECIALTY DISTRIBUTION SERVICES AGREEMENT

Plaintiff and Defendant subsequently entered into a Specialty Distribution Services Agreement dated March 23, 2020 (the "Agreement"). (*Id.* ¶ 34; *see* PSAC at Ex. 1 to Ex. A ("SDSA").) Pursuant to the Agreement, Defendant authorized Plaintiff to purchase and then distribute various dosages and treatment packets of hydroxychloroquine and chloroquine phosphate (together, the "the Product" or "Products"). (*Id.* ¶ 35.) The Agreement provided that Defendant would sell Plaintiff Products, and Plaintiff would gain title of the Products upon delivery. (SDSA § 4.9.) It appears the Agreement then permitted Plaintiff to resell Products to Plaintiff's own customers, though the Agreement also contemplated Plaintiff distributing Products to Defendant's own customers as well. (*See* PSAC ¶¶ 17, 88; SDSA § 4.5.) The Agreement's provisions most relevant to the instant matter are discussed below in greater detail.

#### i.    § 4.1 and § 4.7 (Price)

Section 4.1 of the Agreement specified that the price of the Products sold by Defendant to Plaintiff was "[Defendant's] established wholesale price for distribution in effect at the time of [Defendant's] acceptance of [Plaintiff's] order." (*Id.* ¶ 39 (citing SDSA § 4.1).) While it appears Plaintiff had discretion to set the pricing of Products it resold to its own direct customers, pricing was "not within the discretion of [Plaintiff]" where Plaintiff supplied Products to *Defendant's*—rather than Plaintiff's—customers. (SDSA § 4.5)

Under § 4.7 of the Agreement, if Defendant ever decreased its wholesale price of the Products, Defendant was required to provide Plaintiff with "a check equal to the difference between the price paid for the Product by [Plaintiff] and the lower price multiplied by the number of units of the Product which [Plaintiff] ha[d] in inventory and in transit to [Plaintiff]." (*Id.* ¶ 45 (citing SDSA § 4.7).)

3

ii.    § 4.12 (Returns)

After purchasing Products, Plaintiff was required to warehouse them pursuant to U.S. Food and Drug Administration ("FDA") regulations until such Products were purchased by Plaintiff's customers. (*Id.* ¶ 51.) In the event Plaintiff was unable to sell the Products, § 4.12 of the Agreement provided that Plaintiff could return the Products and receive a refund or credit for "Product which becomes outdated provided the return of such outdated Product is made within six (6) months following the expiration of the Product." (*Id.* ¶¶ 52–53 (citing SDSA § 4.12); *see also id.* ¶ 54 (citing SDSA § 4.12 (noting the refund or credit would be for "the original purchase price" of the Product)).)

iii.    § 10.1 and § 10.2 (Defendant's Representations and Warranties)

Defendant warrantied pursuant to § 10.1 of the Agreement that it would not "manufacture[], repackage[], s[ell] or ship[] [Products] in violation of any applicable federal, state or local law, rule, regulation or ordinance in any material respect." (*Id.* ¶ 49 (citing SDSA § 10.1).) Further, under § 10.2 of the Agreement, Defendant warrantied it would "comply with all applicable federal, state or local laws governing the manufacture, purchase, handling, sale, distribution, and price reporting of Products purchased under [the] Agreement." (*Id.* ¶ 50 (citing SDSA § 10.2).)

iv.    § 11.1 (Indemnification)

Under § 11.1 of the Agreement, Defendant agreed to "indemnify, defend and hold [Plaintiff] and its officers, directors and employees, harmless from and against any and all claims, liabilities and causes of action directly arising from or in any way connected with the Products as a result of [Defendant's] breach of any representation or warranty contained in [the] Agreement or [Defendant's] negligence or willful misconduct," (*id.* ¶ 62 (citing SDSA § 11.1)), conditioned upon: (i) Plaintiff providing prompt, written notice of any claim thereof, (ii) Defendant having the

4

opportunity to conduct a defense; and (iii) Plaintiff cooperating with Defendant in defense of "any such claims, liabilities or causes of action." (*Id.*)

     v.    <u>§ 15.4 (Modifications)</u>

Under § 15.4 of the Agreement, the parties agreed that any amendment to the Agreement would be a "signed, written agreement" between the parties. (*Id.* ¶ 63 (citing SDSA § 15.4).)

### C. PLAINTIFF'S INITIAL PURCHASE

In determining the amount and type of Product Plaintiff would initially purchase from Defendant, Defendant recommended Plaintiff primarily purchase 500-count packages of hydroxychloroquine rather than 250-count packages of hydroxychloroquine. (*Id.* ¶ 66.) While this order was being processed, Defendant sent Plaintiff a notice on its letterhead addressed to its "Valued Customer," noting that due to the increase in demand for hydroxychloroquine, Defendant would "allow [hydroxychloroquine 500-count packages] to be returned for proper disposal but [would] not issue a returns credit for any sales after 3/26/2020 (i.e., all sales are final)" (the "March 26, 2020 Notice"). (*Id.* ¶ 70.) Plaintiff, after receiving the March 26, 2020 Notice, allegedly added a signature line to the notice and had its Chief Executive Officer sign it on March 27, 2020. (*Id.* ¶¶ 70–71.)

Following the March 26, 2020 Notice, Plaintiff continued to purchase Products from Defendant, ultimately purchasing nearly $13,000,000 in Products from Defendant between March 26, 2020 and April 20, 2020. (*Id.* ¶ 75.)

### D. DEFENDANT'S ALLEGED BREACHES OF THE AGREEMENT

As interest in compound chloroquine as a COVID-19 treatment waned in the summer of 2020, Defendant repeatedly reduced its wholesale price for the Products; for example, Defendant reduced the price of hydroxychloroquine 100-count packages from $202.32 to $25.00. (*Id.* ¶ 79–80.) For its part, Plaintiff was left with unsold, aging Products worth $1,673,576.00. (*Id.* ¶ 76–77.)

Plaintiff alleges this decrease in both interest and price of the Products led to three alleged breaches of the Agreement by Defendant.

      i.    <u>Purported Breach of § 11.1 of the Agreement (the Indemnification Provision)</u>

In April 2020, Plaintiff sold $2,622,000.00 of hydroxychloroquine to the State of Oklahoma at $218.50/unit.[5] (*Id.* ¶ 88, 90.) Thereafter, the State of Oklahoma claimed Plaintiff's sale price violated the Oklahoma Emergency Price Stabilization Act and the Oklahoma Consumer Protection Act. (*Id.* ¶ 91.) Plaintiff alleges that "[b]ecause the State of Oklahoma's accusations related solely to the legality of the price . . . and because [Plaintiff] did not have a history of distributing these Products," (*id.* ¶ 94), Plaintiff provided notice to Defendant of the State of Oklahoma's claims and "provided continuous updates and requests for [Defendant] to participate in the negotiations to settle with the State of Oklahoma." (*Id.*) Defendant allegedly "refused to participate or provide guidance in addressing the claims asserted by the State of Oklahoma." (*Id.* ¶ 95.)

Plaintiff and the State of Oklahoma ultimately entered into a Mutual Settlement Agreement on April 27, 2021 whereby Plaintiff refunded the State of Oklahoma the purchase price of the hydroxychloroquine. (*Id.* ¶¶ 96–97.) Plaintiff then demanded indemnification from Defendant in relation to the Mutual Settlement Agreement, (*id.* ¶ 118), but Defendant allegedly "refused to respond to those demands." (*Id.* ¶ 119.)

      ii.    <u>Purported Breach of § 4.12 of the Agreement (the Returns Provision)</u>

After consumer interest in the Products decreased, Plaintiff repeatedly sought to return the Products to Defendant in exchange for a refund or credit. (*See id.* ¶107 (alleging attempt to return Products in April 2020); ¶ 110 (same in the fall of 2020); ¶¶ 112–113 (same in November 2021);

---

[5] At the time of Plaintiff's sale to the State of Oklahoma, Defendant's wholesale price for hydroxychloroquine was allegedly $219.91/unit. (PSAC ¶ 89.)

¶ 120 (noting four subsequent demands were made in August 2022, September 2022, April 2023, and September 2023).) Despite acknowledging Plaintiff's return requests on multiple occasions, (*id.* ¶¶ 109, 114–15), Defendant "failed to issue the necessary paperwork which would allow [Plaintiff] to return the Product." (*Id.* ¶ 109.) For example, Plaintiff sought Defendant's permission to return the Products sold to the State of Oklahoma or, alternatively, receive a refund for the difference between the purchase price from the time the State of Oklahoma purchased the Product to the current price then listed by Defendant. (*Id.* ¶ 110.) Defendant allegedly refused those requests. (*Id.* ¶ 111.) Plaintiff alleges that its requests for returns and refunds total $4,295,576.86. (*Id.* ¶ 116.) Plaintiff also "continues to incur costs in storing the [Products] pursuant to FDA mandated requirements" and "continues to suffer financial detriment in carrying and warehousing costs for the hydroxychloroquine." (*Id.* ¶ 86.)

iii.    <u>Purported Breach of § 4.7 of the Agreement (the Price Provision)</u>

After Defendant reduced the Products' wholesale price, Plaintiff requested a price reduction check from Defendant in the summer of 2020. (*Id.* ¶ 81.) However, Defendant "did not provide [Plaintiff] with a check equal to the difference between the purchase price and the reduced price for the Product for the quantity that remained in [Plaintiff's] inventory." (*Id.* ¶ 82.) Despite reiterating its demand for a price reduction check in October 2020, November 2020, and February 2021, Defendant "refused to implement a price reduction." (*Id.* ¶¶ 103–105.) Plaintiff alleges it is owed damages "in excess of $2,382,294.20," as well as associated costs. (*Id.* ¶ 166.)

**E.  THE INSTANT LAWSUIT**

In light of these alleged breaches, Plaintiff sent Defendant formal notices to comply with the Agreement on four separate dates: August 15, 2022; September 13, 2022; April 24, 2023; and

September 26, 2023.[6] (*Id.* ¶ 120.) Thereafter, Plaintiff filed its initial Complaint in this matter on October 2, 2023. (ECF No. 1.) Plaintiff alleged two counts of breach of contract, one count of fraud, and one count of misrepresentation. (*See id.* at 19–31.) After a failed mediation, (ECF No. 20), Plaintiff filed its First Amended Complaint, which included the same four counts as the initial Complaint, but added an additional breach of contract count. (ECF No. 24 at 18–30.)

Defendant answered the First Amended Complaint and brought two counterclaims for breach of contract and account stated. (ECF No. 25.) Plaintiff answered the counterclaims. (ECF No. 28.) Defendant then filed the instant Motion for Judgment on the Pleadings on all counts of the First Amended Complaint, (ECF No. 31), and Plaintiff cross-moved for leave to file a Second Amended Complaint, (ECF No. 33).[7]

## II.    LEGAL STANDARD

### A. FEDERAL RULE OF CIVIL PROCEDURE 15

Federal Rule of Civil Procedure ("Rule") 15 permits a party to amend its pleading once as a matter of course within 21 days of service or 21 days after service of a responsive pleading or service of a motion under Rule 12(b), (e), or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1).

---

[6] Defendant notes these notices relate to Defendant's alleged breach of § 4.12 of the Agreement (the Returns Provision), and that the notices do not reference Defendant's purported breach of § 4.7 of the Agreement (the Price Provision). (Open. Br. at 26.)

[7] Plaintiff argues in its opposition to Defendant's Motion that "summary dismissal of [Defendant's] motion is warranted" because "[w]hile [Defendant] previously submitted a pre-motion request letter in connection with its intended motion to dismiss, it filed the instant motion for judgment on the pleadings without submitting the required letter." (Oppo. Br. at 1.) Indeed, this Court's preferences are for a party to "submit a letter, not to exceed three (3) single-spaced pages, requesting a pre-motion conference" prior to filing a motion for judgment on the pleadings. (Rules and Procedures, the Hon. Robert Kirsch, U.S.D.J., at I(A).)

However, Defendant *did* file a pre-motion letter prior to its contemplated motion to dismiss. (*See* ECF No. 12.) The Court construes the instant Motion as simply the post-mediation fruition of Defendant's prior-contemplated motion to dismiss. Further, the purpose of this Court's Rule I(A) is to "advance the case efficiently and minimize the costs of litigation to the parties." (Rules and Procedures at I(A).) The Court finds that to dismiss Defendant's Motion on such technical grounds as requested by Plaintiff, the Court would inefficiently be putting "form over substance"—and deciding this Motion on the merits will narrow the issues for the parties substantially.

Otherwise, a party can only amend "with the opposing party's written consent or the court's leave." Fed. R. Civ. P 15(a)(2). A motion for leave to amend a complaint is "addressed to the sound discretion of the district court." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001). A district court "may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party." *Id.* at 273. A district court may also deny leave to amend where "the movant fails to provide a draft amended complaint," or the amendment "fails to state a cause of action." *Id.*

### B. FEDERAL RULE OF CIVIL PROCEDURE 12(C)

Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial— a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The pleadings are 'closed' after the complaint and answer are filed, along with any reply to additional claims asserted in the answer." *Horizon Healthcare Servs., Inc. v. Allied Nat. Inc.*, 2007 WL 1101435, at *3 (D.N.J. Apr. 10, 2007). Under Rule 12(c), "judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (internal quotation marks and citation omitted).

In reviewing a motion for judgment on the pleadings, courts apply the same standard as when reviewing a motion to dismiss under Rule (12)(b)(6). *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991) (citations omitted); *see also Muhammad v. Sarkos*, 2014 WL 4418059, at *1 (D.N.J. Sept. 8, 2014). Under Rule (12)(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the court must

accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips*, 515 F.3d at 231; *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 406 (D.N.J. 2018). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers labels and conclusions or a formulistic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). As such, "[a] complaint should not be dismissed unless it appears beyond doubt that the facts alleged in the complaint, even if true, fail to support the claim." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 324 (D.N.J. 1999) (internal quotations omitted). In considering a Rule 12(c) motion, courts may only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[8] *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (citation omitted). "[B]efore dismissing a complaint under Rule 12(c), 'a district court must permit a curative amendment, unless an amendment would be inequitable or futile.'" *In re Nat'l Pool Const., Inc.*, No. 12-2157, 2012 WL 3277107, at *2 (D.N.J. Aug. 9, 2012) (quoting *Phillips*, 515 F.3d at 236).

---

[8] The Court notes that Defendant has attached declarations to its Motion containing exhibits of (i) publicly-available records regarding Plaintiff's settlement with the State of Oklahoma, (*see* ECF Nos. 31-3–31-6), (ii) the "formal notices demanding [Defendant] . . . comply with the Agreement" from 2022–2023 referenced in ¶ 120 of the Proposed Second Amended Complaint, (*see* ECF Nos. 31-9–31-12), and (iii) a purported modification of the Agreement dated March 18, 2020, (*see* ECF No. 31-8). However, the Court finds that none of these exhibits are determinative to the Court's analysis, and therefore does not rely on Defendant's declarations in issuing this Opinion.

## III.    DISCUSSION

### A. PLAINTIFF'S CROSS-MOTION FOR LEAVE TO AMEND

Plaintiff asserts that it satisfies "the liberal standards set forth in Federal Rule of Civil Procedure 15(a) for leave to amend" because Plaintiff (i) did not delay in filing its Cross-Motion, and (ii) did not act in bad faith. (Oppo. Br. at 33.) Plaintiff also claims Defendant would not be prejudiced by another amendment because Plaintiff's "claims are unchanged from the First Amended Complaint. [Plaintiff] merely seeks leave to amend in order to address factual discrepancies that have come to light during the litigation." (*Id.* at 34.)

For its part, Defendant argues that the Proposed Second Amended Complaint "does nothing to undermine" its Motion. (Reply Br. at 1.) Indeed, Defendant welcomes the Court to construe its Motion "as if directed at the Second Amended Complaint." (*Id.* at 2.) Because courts use "the same standard of legal sufficiency" as applied to a motion to dismiss under Rule 12(b)(6) to consider the futility of amendment under Rule 15(a), *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000), the Court will base its legal analysis on the facts alleged in the Proposed Second Amended Complaint to determine both (i) whether Defendant is entitled to judgment on the pleadings; and (ii) whether granting Plaintiff leave to amend would be futile. *See Cherry Hill Partners at Vill. Place, L.L.C.*, 2011 WL 2610171, at *1 n.1. For reasons explained in greater detail below, the Court will grant Plaintiff's Cross-Motion for Leave to File a Second Amended Complaint as to Counts II–III, but deny Plaintiff's Cross-Motion as to Counts I, IV, and V—because, for the reasons discussed below—any further amendment would be futile.

### B. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

At the outset, the Court notes that, per the Agreement's choice-of-law provision, California law governs Plaintiff's breach of contract claims. (*See* SDSA § 15.7 (stating the Agreement "shall be construed and enforced in accordance with the laws of the State of California").) Under

California law, the elements of a breach of contract claim are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."[9] *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011). The parties' disputes regarding Plaintiff's breach of contract claims center around the third element (*i.e.*, whether Defendant actually breached the Agreement).

      i.    <u>Count I – Breach of Contract (Indemnification) and Count V – Misrepresentation (Price)</u>

The indemnification provision of the Agreement states:

> [Defendant] shall indemnify, defend and hold [Plaintiff] and its officers, directors and employees, harmless from and against any and all claims, liabilities and causes of action directly arising from or in any way connected with the Products as a result of [Defendant's] breach of any representation or warranty contained in this Agreement or [Defendant's] negligence or willful misconduct, conditioned upon the following: (a) [Plaintiff] gives [Defendant] prompt written notice of any such claims, liabilities, causes of action or threats thereof, (b) [Defendant] has full opportunity to conduct the defense of any such claims, liabilities or causes of action, and (c) [Plaintiff] cooperates with [Defendant] in the defense of any such claims, liabilities or causes of action. *This indemnity shall not apply to the extent such claims, liabilities or causes of action are caused by the fault, breach of contract, tort (including negligence and strict liability) of [Plaintiff].*

(SDSA § 11.1 (emphasis added).) Plaintiff alleges that Defendant breached this provision "by failing to defend and indemnify" Plaintiff with respect to its Mutual Settlement Agreement with the State of Oklahoma in connection with its sale of hydroxychloroquine to the State. (PSAC ¶ 136.) Here, the Court understands Plaintiff's factual predicate to be as follows: *first,* "[Defendant] warranted [sic] and represented [in the Agreement] that its practices and policies complied with 'applicable federal, state or local law, rule, regulation or ordinance in any material

---

[9] The Court will address the applicable law governing Plaintiff's fraud claims when it reaches those claims in its analysis.

respect," (*id.* ¶ 123 (citing SDSA § 10.1)); *second,* the Agreement provides Plaintiff a right to indemnification for "claims, liabilities and causes of action . . . as a result of [Defendant's] breach of any representation or warranty contained" in the Agreement, (*id.* ¶ 125 (citing SDSA § 11.1)); *third*, after purchasing the Products from Defendant, Plaintiff resold hydroxychloroquine to the State of Oklahoma at a price that "was below [Defendant's] published wholesale acquisition price." (*Id.* ¶ 127); and *fourth*, this resulted in the State of Oklahoma alleging Plaintiff's resale price "violated the Oklahoma Emergency Price Stabilization Act and the Oklahoma Consumer Protection Act." (*Id.* ¶ 128.) Therefore, Plaintiff posits that if Plaintiff's resale price—which was allegedly lower than Defendant's wholesale price—violated Oklahoma law, Defendant's wholesale price *also* violated Oklahoma law, and therefore, Defendant breached its representations and warranties within the Agreement, which entitles Plaintiff to indemnification. (*See id.* ¶ 129.)

The relevant representations and warranties are found within § 10.1 and § 10.2 of the Agreement. § 10.1 states in relevant part:

> [Defendant] warrants that the Products shipped or delivered to [Plaintiff] . . . (b) will not, at the time of delivery to [Plaintiff] be . . . (iii) manufactured, repackaged, sold or shipped in violation of any applicable federal, state or local rule, regulation or ordinance in any material respect.

(SDSA § 10.1.) § 10.2 states:

> [Defendant] has and will maintain, in full force and effect, all licenses and permits required, and shall comply with all applicable federal, state or local laws governing the manufacture, purchase, handling, sale, distribution, and price reporting of Products purchased under this Agreement.

(SDSA § 10.2.)

Defendant argues that it is entitled to judgment on the pleadings on Count I because it never violated these representations and warranties, and consequently, it was not obligated to indemnify Plaintiff for its improper resale to the State of Oklahoma.

The Court agrees and finds Count I to be without merit. The material facts are not in dispute. *First*, the plain language of the Agreement is clear that Defendant's representations and warranties apply to Defendant's sales of the Products "to Plaintiff." § 10.1 and § 10.2 of the Agreement are silent with respect to Plaintiff's downstream resales to its own customers. (*See* SDSA § 10.1 (covering sales "*to [Plaintiff] . . . at the time of delivery to [Plaintiff]*"); SDSA § 10.2 (covering Products "*purchased under [the] Agreement*").) Conversely, "[t]he product that [Plaintiff] sold to Oklahoma was purchased under a separate agreement between [Plaintiff] and Oklahoma . . . not the Agreement between [Defendant] and [Plaintiff]." (Open. Br. at 19.) In fact, "nowhere in the Agreement did [Defendant] set any of the prices at which [Plaintiff] could resell Products to its customers. Nor did the Agreement give [Defendant] the right to dictate those prices." (*Id.* at 17.)

Under Count I, the Court finds Plaintiff is not alleging any facts that would implicate § 10.1 and § 10.2 of the Agreement. For example, Plaintiff does not allege that the sale of Products *from* Defendant *to* Plaintiff violated "any applicable federal, state or local law, rule, regulation or ordinance." (*See* SDSA § 10.1.) Indeed, other provisions of the Agreement make clear that it was actually *Plaintiff's* obligation to "comply with all laws governing its business related to the sale or distribution of the Products," (*id.* § 2.1), and that once Defendant delivered Products to Plaintiff, it was *Plaintiff* that retained title over the Products. (SDSA § 4.9.)

*Second*, while Plaintiff raises that the Agreement required Plaintiff "to use [Defendant's] contract price to resell the Products *in the event [Defendant] had an agreement with the customer*,"

(Oppo. Br. at 4 (citing SDSA § 4.5)), there are no allegations that Defendant had a customer agreement with the State of Oklahoma. There are also no allegations nor evidence suggesting Defendant explicitly advised or guided Plaintiff's decisions as how to price its resales. In fact, Plaintiff went so far as to *remove* allegations from the Proposed Second Amended Complaint that previously suggested Defendant set the price Plaintiff could charge its resale customers. (*See, e.g.*, ECF No. 33-3 at 7, 21, 27.)

*Third*, Plaintiff's argument that it is somehow blameless for its failure to comply with Oklahoma law because "only [Defendant] had knowledge as to the cost structure of manufacturing the Product," (Oppo. Br. at 17), is unpersuasive and strains the bounds of credulity. Even accepting that "[Plaintiff] had not been a mass distributor of [the Products]" prior to its contract with Defendant, Plaintiff alleges it "has been recognized as the nation's leading supplier of critical care biopharmaceuticals, plasma products, and vaccines" since 1988, (PSAC ¶ 7), and that it has "nearly three billion dollars in annual sales" and a "reputation as the largest and most trusted distributor" of critical-care pharmaceutical products in the United States. (*Id.* ¶ 8.) Plaintiff's self-described and uncontested status as a sophisticated business belies its purported blind-faith reliance on a wholesale price set by Defendant—a Delaware corporation with a principal place of business in New Jersey—as a legally-permissible price for a resale to the State of Oklahoma.[10]

As Plaintiff notes, "[w]here . . . parties have expressly contracted with respect to the duty to defend and indemnify, the extent of that duty must be determined from the contract." (Oppo. Br. at 14 (citing *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622, 627 (Cal. 1975)).) The

---

[10] Plaintiff also attempts to argue that it is "standard in the industry" for suppliers to rely on manufacturers' wholesale prices in setting their resale prices. (Opp. Br. at 3.) However, even if this were true, it does not alter the executed Agreement, which does not contain an explicit representation or warranty by Defendant regarding Plaintiff's resale pricing. *See Carolina Beverage Corp. v. FIJI Water Co., LLC*, 102 Cal. App. 5th 977, 991 (Cal. Ct. App. 2024) (citing *Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 790 (Cal. 1955)) (noting "industry standards cannot be used to rewrite a contract").

Agreement does not require Defendant to indemnify Plaintiff for Plaintiff's own purported lack of due diligence with respect to setting its resale prices. Because Plaintiff does not allege any issue of legality with respect to Defendant's direct sales of the Products to Plaintiff, there can be no breach of Defendant's representations and warranties under § 10.1 and § 10.2 of the Agreement, and consequently, as a legal matter, no breach of the Agreement's indemnification provision. Thus, Plaintiff's breach of contract claim in Count I fails. Any further amendment of Count I by Plaintiff in an attempt to hold Defendant liable for Plaintiff's own, unilateral legal error is futile. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.") Therefore, the Court finds that judgment on the pleadings in favor of Defendant on Count I is appropriate. Because the Court finds amendment to be futile, the Court will also deny Plaintiff leave to further amend Count I.

For these same reasons, judgment on the pleadings in favor of Defendant on Count V is also appropriate. Plaintiff alleges Defendant negligently misrepresented within the Agreement "that its pricing was lawful," (PSAC ¶ 190), and that Plaintiff's reliance on this misrepresentation "was reasonable," (*id.* ¶ 203), as Plaintiff "relied on [Defendant] to set lawful prices for the Products." (Oppo. Br. at 29.) However, as described above, the Agreement does not include a representation or warranty by Defendant concerning the lawfulness of its wholesale price as applied to Plaintiff's subsequent resales to customers across the country. There can be no "misrepresentation" where no representation was made. Accordingly, the Court grants judgment on the pleadings in favor of Defendant on Count V. Further, given Plaintiff's failure to allege the requisite misrepresentation within the Proposed Second Amended Complaint, the Court finds further amendment to be futile and denies Plaintiff leave to amend Count V. *See Am. Corp. Soc'y*

*v. Valley Forge Ins. Co.*, 424 F. App'x 86, 90 (3d Cir. 2011) (citation omitted) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed . . .").

ii.    Count II – Breach of Contract (Returns)

Plaintiff alleges that Defendant breached the Agreement by failing to accept returns of Products and issue a refund or credit to Plaintiff. (*See* PSAC ¶¶ 139–150.) Indeed, § 4.12 of the Agreement states in part:

> Returns. [Plaintiff] will have the right to return to [Defendant] and receive a refund, or, upon mutual agreement of the parties, a credit for . . . (iii) Product which becomes outdated provided the return of such outdated Product is made within six (6) months following the expiration of the Product.

(SDSA § 4.12.) However, the crux of the parties' dispute lies in whether the March 26, 2020 Notice, which was signed by Plaintiff on Defendant's letterhead and indicated that Defendant would "not issue a returns credit" for certain of the Products, constitutes an enforceable modification of the Agreement.[11] Plaintiff argues that there are disputes of fact as to whether the March 26, 2020 Notice can properly be considered a modification. (*See* Oppo. Br. at 22.)

The March 26, 2020 Notice states:

> Dear Valued Customer,
>
> Due to the recent increase in demand over and above regular forecast quantities, [Defendant] will allow the products listed in the below table to be returned for proper disposal but will not issue a returns credit for any sales after 03/26/2020 (i.e. all sales are final).

| NDC | Product Description |
|---|---|
| 42385-927-01 | HYDROXYCHLOROQUINE TAB 200MG 100CT |

---

[11] Defendant also attaches to its Motion a second purported modification of the Agreement dated March 18, 2020 that appears to be substantively identical to the modification referenced in the Proposed Second Amended Complaint aside from listing non-returnable chloroquine products as opposed to non-returnable hydroxychloroquine products. (*See* ECF No. 31-8.)

| 42385-927-05 | HYDROXYCHLOROQUINE TAB 200MG 500CT |
|---|---|

> We are working closely with our supplier and manufacturing partners to ramp up inventories and will make every effort to supply the product where needed. Please make the necessary updates in your systems at your earliest convenience and contact us if you have any remaining questions.
>
> Thank you,
>
> [Defendant]

(PSAC ¶ 70.) "Where there is conflicting evidence[,] the question whether the parties to an agreement entered into a modification . . . is a question of fact." *Howard v. Cnty. of Amador*, 220 Cal. App. 3d 962, 980 (Cal. Ct. App. 1990). Here, Plaintiff alleges the purported modification was actually a "template notice[]" that was "to be used if [Plaintiff's] existing agreements with its customers otherwise allowed returns." (PSAC ¶ 70, 71.) In other words, Plaintiff appears to allege that Defendant provided a template notice for Plaintiff to use in the event Plaintiff wished to notify its own direct customers that returns would no longer be accepted. Plaintiff asserts that Defendant provided the March 26, 2020 Notice "without providing on the template any requirement for [Plaintiff] to sign," and rather, Plaintiff "added its own signature line" to the notice. (*Id.* ¶ 71.)

Conversely, Defendant argues that its "proposed modification" was sent "to [Plaintiff] on its form letterhead which [Plaintiff] executed and returned," satisfying California law regarding proper modifications to contracts. (Open. Br. at 23–24.) However, there is clearly a dispute of material fact as to the purpose and intention of the March 26, 2020 Notice. *See Simmons v. Comm'r Gary Lanigan*, No. 16-4215, 2020 WL 5500280, at *2 (D.N.J. Sept. 11, 2020) (denying motion for judgment on the pleadings where genuine dispute of material fact remained). For example, the March 26, 2020 Notice is not addressed directly to Plaintiff, but rather, Defendant's "Valued Customer." (PSAC ¶ 70.) Further, the March 26, 2020 Notice allegedly did not require Plaintiff to

sign in assent (and rather, Plaintiff added the signature line itself). (*Id.* ¶ 71.) Therefore, given the lack of factual clarity concerning the March 26, 2020 Notice, the Court denies Defendant's Motion with respect to Count II and grants Plaintiff leave to amend Count II.

     iii.   <u>Count III – Breach of Contract (Price)</u>

Section 4.7 of the Agreement states:

> Inventory Price Protection. In the event [Defendant] decreases the price of a Product, [Defendant] shall provide [Plaintiff] with a check equal to the difference between the price paid for the Product by [Plaintiff] and the lower price multiplied by the number of units of the Product which [Plaintiff] has in inventory and in transit to [Plaintiff].

(SDSA § 4.7.) Plaintiff alleges that "[f]ollowing the substantial decrease in demand" of the Products, Defendant decreased the price of the Products. (PSAC ¶ 159.) Plaintiff then requested price reduction checks from Defendant in the summer of 2020, October 2020, November 2020, and February 2021. (*Id.* ¶¶ 81, 103–104.) However, to date, Defendant "has not provided [Plaintiff] with a check equal to the difference between the purchase price and the reduced price for the Product with respect to the quantity of the Product that remains in [Plaintiff's] inventory, thus breaching the Agreement." (*Id.* ¶ 164.)

     Defendant does not appear to dispute the plain language of the Agreement, nor even Plaintiff's allegations that it requested price reduction checks from Defendant in the summer of 2020, October 2020, November 2020, and February 2021. (Open. Br. at 27; *see* PSAC ¶¶ 81, 103–104.) Rather, Defendant argues that "[n]owhere does the Amended Complaint allege that [Plaintiff] thereafter gave [Defendant] notice that it was in breach for allegedly failing to send price reduction checks." (Open. Br. at 25–26.) While Defendant acknowledges Plaintiff sent notices related to Defendant's alleged breach of § 4.12 of the Agreement (the Returns Provision),

it notes that those notices do not reference Defendant's purported breach of § 4.7 of the Agreement (the Price Provision) at issue in Count III. (*Id.* at 26.)

Under the California Commercial Code, a buyer asserting breach "must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code Ann. § 2607(3)(A). Plaintiff argues that its multiple requests for price reduction checks were effectively notices of breach because "the Agreement required [Defendant] to send a check for the price reductions without [Plaintiff] requesting payment." (Oppo. Br. at 25.) Therefore, at the time Plaintiff had to request a price reduction check from Defendant, Defendant was already in breach. Defendant replies that Plaintiff's argument is nonsensical because Defendant could not issue a price reduction check without first being informed by Plaintiff of "the number of units of the Product which [Plaintiff] has in inventory and in transit to [Plaintiff]." (Reply Br. at 12–13; *see* SDSA § 4.7.)

There is insufficient evidence before the Court on this point to make a determination at this juncture. California law does not require "particular words which must be used to constitute an adequate form of notice" of breach. *United Food Grp., LLC v. Cargill, Inc.*, No. 11-7752, 2014 WL 12925561, at *5 (C.D. Cal. Feb. 14, 2014). Whether Plaintiff's requests for price reduction checks can be properly construed as sufficient notice of breach is not a question of law appropriate for resolution at this stage of the proceedings.[12] Rather, "the issue of timeliness and sufficiency are questions of fact." *Id.* (citations omitted). Given the existence of a genuine dispute of material fact regarding whether Defendant was on notice of breach of § 4.7 of the Agreement prior to

---

[12] Neither party has provided the Court with Plaintiff's requests for price reduction checks, such that the Court cannot analyze the factual question of the sufficiency of Plaintiff's notices at this time. Discovery on this issue may help develop a more fulsome record.

Plaintiff filing this action, the Court denies Defendant's Motion with respect to Count III and grants Plaintiff leave to amend.

      iv.    <u>Count IV – Fraud (Returns)</u>

Before analyzing Count IV, the Court notes at the outset that because the Court's diversity jurisdiction controls the instant suit, this Court must "apply the conflicts of laws principles of the forum in which [it] sit[s]." *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 478 n.7 (D.N.J. 2002). However, "[u]nder New Jersey law, when the same result—dismissal of a complaint—is required under the laws of all relevant jurisdictions, the court need not decide which law would apply to the action." *Port Auth. of New York & New Jersey v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir. 1999). The elements of fraud under both New Jersey and California law are near-identical. Under New Jersey law, the elements of fraud are, "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). Under California law, elements of the same are "(a) misrepresentation; (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805, 820 (Cal. Ct. App. 2011) (cleaned up). Therefore, because the elements under both states' laws are essentially the same, and because dismissal of Count IV is warranted under either law, the Court need not conduct a choice-of-law analysis here with respect to Plaintiff's fraud claim.

Plaintiff appears to allege one instance of fraud in connection with the Agreement's terms and two further instances of fraud in connection with representations made by Defendant after the signing of the Agreement. At bottom, all of Plaintiff's allegations here relate back to Plaintiff's

expectation that Defendant would accept returns of Products for a refund or credit pursuant to the terms of the Agreement. The Court will address both categories of instances of fraud in turn.

*a. Fraud Pursuant to the Terms of the Agreement*

Plaintiff alleges it purchased Products from Defendant "with the confidence that the Agreement allowed returns on expiring or expired Product for a refund from [Defendant]." (PSAC ¶ 173.) Plaintiff further claims that Defendant "intended [Plaintiff] to rely on the contractual assurances that it could return unsold Product while knowing that it never intended to honor the contractual term." (*Id.* ¶ 176.) Defendant argues that the "economic loss" doctrine precludes Plaintiff from pursuing a fraud claim on these grounds. (Open. Br. at 29–32.)

Under New Jersey law, "the economic loss doctrine prohibits a party from recovering in tort economic losses arising out of the breach of a contract." *Lab'y Corp. of Am. v. Fusion Diagnostics Lab'ys*, LLC, No. A-1100-18T4, 2020 WL 476882, at *5 (N.J. Super. Ct. App. Div. Jan. 30, 2020) (citing *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 296 (N.J. 2010)). Dismissal is appropriate under the economic loss doctrine where a party fails "to allege any facts to support [its] claim beyond those alleged to support [its] breach of contract claim." *Id.* Similarly, under California law, "tort recovery for breach of a contract duty is generally barred." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 20 (Cal. 2024). In order to avoid dismissal, two conditions must be satisfied:

> A plaintiff must first demonstrate the defendant's injury-causing conduct violated a duty that is independent of the duties and rights assumed by the parties when they entered the contract. Second, the defendant's conduct must have caused injury to persons or property that was not reasonably contemplated by the parties when the contract was formed.

*Id.*

Plaintiff's only defense to Defendant's invocation of the economic loss doctrine is that "New Jersey and California [c]ourts have permitted a fraud claim to proceed with a breach of contract claim when they generally appear to involve a situation based on pre-contractual misrepresentations or where the contract is fraudulently induced."[13] (Oppo. Br. at 25.) However, "'[t]he distinction between fraud in the inducement and fraud in the performance of a contract' is 'the conceptual distinction between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and *the subsequent failure of the promisor to do what he has promised*.'" *JD James Constr., LLC v. PDP Landscaping, LLC*, No. A-4903-18T3, 2020 WL 5587439, at *6 (N.J. Sup. Ct. App. Div. Sept. 18, 2020) (emphasis added) (quoting *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563 (D.N.J. 2002)) (noting the "critical issue" under the economic loss doctrine is "whether the allegedly tortious conduct is extraneous to the contract").

The Court finds that the economic loss doctrine—under both New Jersey and California law—bars Plaintiff's fraud claim on the basis of misrepresentations purportedly found within the Agreement. *See Rattagan*, 17 Cal. 5th at 23 ("Courts generally permit tort suits if the defendant allegedly violated a duty rooted in tort principles *that is independent of the parties' contractual rights and obligations . . .*" (emphasis added)); *Int'l Minerals & Mining Corp. v. Citicorp N.A., Inc.*, 736 F. Supp. 587, 597 (D.N.J. 1990) ("It has . . . consistently been held that an independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself.").

---

[13] On this point, the Court notes that Plaintiff does not identify any pre-contractual misrepresentations with respect to Defendant's return policy, nor allege a claim of fraudulent inducement beyond a single conclusory allegation that Defendant "ma[de] the representation [regarding the Agreement's return policy] to induce [Plaintiff] to purchase the pharmaceutical Products . . ." (PSAC ¶ 174; *see also id.* ¶ 58.)

Here, it is clear that the "duty" Plaintiff appears to allege Defendant breached—to accept [Plaintiff's] return of Products—is derived from the terms of the Agreement. (*See* SDSA § 4.12.) Defendant had no—and Plaintiff [cannot] identify—any independent duty under the laws of tort to accept Plaintiff's returns. Indeed, the California Supreme Court recently confirmed that "[w]hen a contractual breach results only in economic losses, the pecuniary injury may fall within the scope of parties' precontractual expectations and their allocation of risks, and it is less likely to implicate the breach of a tort duty independent of their contractual rights and obligations." *Rattagan*, 17 Cal. 5th 1, 26.

Because the economic loss doctrine would prevent Plaintiff from stating a claim of fraud based on Defendant's duties derived from the terms of the Agreement as a matter of law, the Court finds that Defendant's Motion should be granted as it relates to fraud alleged by Plaintiff in Count IV. The Court also denies Plaintiff leave to amend as any further amendment would be futile. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434 (noting where a complaint, as amended, would fail to state a claim, the amendment is futile).

### b. *Fraud Post-Dating the Signing of the Agreement*

Plaintiff also alleges that "[e]ven after the Agreement was executed and [Defendant] had forwarded the [March 26, 2020 Notice] to customers, [Defendant] in April 2020 continued to represent that it would accept returns . . ." (PSAC ¶ 177.) Further, "[f]or months, [Defendant] assured [Plaintiff] that it would accept the returns," (*id.* ¶ 183), like "for example, on January 6, 2022, [Defendant] acknowledged the return of hydroxychloroquine and chloroquine phosphate totaling $4,295,576.86, and [Defendant] proceeded with the customary return process." (*Id.* ¶ 184.) According to Plaintiff, Defendant "knew that it did not intend to honor any commitment to allow the hydroxychloroquine and chloroquine phosphate to be returned for a refund." (*Id.* ¶ 180.)

However, Defendant argues that these allegations fail to rise to the level of specificity required to state a fraud claim under Rule 9(b). (Open. Br. at 32–33.) The Court agrees.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The complaint must allege "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations and quotations omitted).

Plaintiff argues that it "sets forth factual allegations to support its claims for fraud and misrepresentation," (Oppo. Br. at 26), but it fails to argue how its allegations actually meet Rule 9(b)'s heightened pleading standard. The Proposed Second Amended Complaint "fails to state exactly what statements were made" by Defendant in April 2020 and "for months" afterwards regarding accepting returns. *See Frick v. Novartis Pharms. Corp.*, No. 05-5429, 2006 WL 1344316, at *2 (D.N.J. May 16, 2006). "Since Plaintiff has failed to satisfy the pleading requirements of Rule 9(b) in [its] [Proposed Second] Amended Complaint, after having the opportunity to replead and provide additional facts to support [the] fraud-based claims," the Court will grant judgment on the pleadings in favor of Defendant with respect to Count IV. *See Glushakow v. Boyarsky*, No. 11-2917, 2011 WL 6020550, at *5 (D.N.J. Dec. 1, 2011).

To the extent Plaintiff's allegations regarding Defendant's acknowledgement of returns on January 6, 2022, (*see* PSAC ¶ 184), could be construed as meeting Rule 9(b)'s heightened pleading

standard, the allegations fail to state a claim upon which relief can be granted. Both New Jersey and California require a "misrepresentation" to be alleged as part of a claim of fraud. *See Gennari*, 691 A.2d at 367; *Hypertouch, Inc.*, 192 Cal. App. 4th at 820. Plaintiff does not allege that Defendant's acknowledgment of returns was itself a misrepresentation, and thus, the Proposed Second Amended Complaint fails to state a claim for fraud based on this allegation. *See Dophin v. Bank of Am. Mortg. Co.*, 641 F. App'x 131, 133–34 (3d Cir. 2016) ("[W]hile Dophin repeatedly accuses BANA of fraud, she has not identified a 'material misrepresentation of fact' that she relied on to her detriment, which is the foundation of a fraud claim under New Jersey law"); *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1141 (E.D. Cal. 2013) (dismissing with prejudice California fraud claim where the "complaint lack[ed] sufficient facts to support the misrepresentation element"). Accordingly, the Court grants Defendant's Motion with respect to Count IV and denies as futile Plaintiff leave to amend. *See Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) ("A proposed amendment to a complaint is futile if the amended complaint would fail to state a claim for relief under Rule 12(b)(6).")

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings, (ECF No. 31), is **GRANTED** in part and **DENIED** in part, and Plaintiff's Cross-Motion for Leave to File a Second Amended Complaint, (ECF No. 33), is **GRANTED** in part and **DENIED** in part. Counts I, IV, and V of the First Amended Complaint, (ECF No. 24), are **DISMISSED** with prejudice. Plaintiff may file a Second Amended Complaint with respect to the remaining Counts II and III. An appropriate Order accompanies this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: December 4, 2024