NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FFF ENTERPRISES, INC., <br><br> Plaintiff, <br> v. <br><br> RISING PHARMA HOLDINGS, INC., <br><br> Defendant. | Civil Action No. 23-20837 (RK) (JTQ) <br><br> **MEMORANDUM ORDER** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Plaintiff FFF Enterprises, Inc.'s ("Plaintiff") Motion for Reconsideration (ECF No. 52) of this Court's Opinion and Order ("Opinion," ECF No. 50; *see* ECF No. 51) granting in part and denying in part Defendant Rising Pharma Holdings, Inc.'s ("Defendant") Motion for Judgment on the Pleadings (ECF No. 31).[1] Defendant filed an opposition to the Motion (ECF No. 55), and Plaintiff replied (ECF No. 61). Having carefully considered the parties' submissions, the Court decides the Motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Plaintiff's Motion (ECF No. 52) is **DENIED**.

I.     **BACKGROUND**

Plaintiff seeks a partial reconsideration of this Court's Opinion and Order, namely the dismissal with prejudice of Count I of Plaintiff's First Amended Complaint. (ECF No. 24.) Thus, the Court provides only the background necessary to resolve this issue.[2]

---

[1] The Opinion and Order also addressed Plaintiff's Cross-Motion for Leave to File a Second Amended Complaint. (*See* ECF No. 33.)

[2] The Court describes the factual background of this case in greater detail in its Opinion granting in part and denying in part Defendant's Motion for Judgment on the Pleadings. (*See* ECF No. 50.)

In the early days of the COVID-19 pandemic, Plaintiff, a pharmaceutical drug supplier, entered into a Specialty Distribution Services Agreement (the "Agreement") with Defendant, a pharmaceutical drug manufacturer. (*See* "PSAC,"[3] ECF No. 33-2 at ¶¶ 7, 12, 34; *see also* PSAC at Ex. 1 to Ex. A ("SDSA").) At the time, Defendant was licensed to manufacture hydroxychloroquine and chloroquine phosphate (together, the "Product" or "Products")—which were considered in March 2020 to be possible treatments for COVID-19. (PSAC ¶¶ 22, 26.) Pursuant to the Agreement, Defendant authorized Plaintiff to purchase and then distribute various dosages and treatment packets of the Products. (*Id.* ¶ 35.) The Agreement appears to have both permitted Plaintiff to resell Products to Plaintiff's own customers and distribute Products to Defendant's customers. (*See id.* ¶¶ 17, 88; SDSA § 4.5.)

Section 4.1 of the Agreement specified that the price of the Products sold by Defendant to Plaintiff was "[Defendant's] established wholesale price for distribution in effect at the time of [Defendant's] acceptance of [Plaintiff's] order." (PSAC ¶ 39 (quoting SDSA § 4.1).) While it appears that Plaintiff had discretion to set the pricing of Products it resold to its own direct customers, pricing was "not within the discretion of [Plaintiff]" where Plaintiff supplied Products to Defendant's—rather than Plaintiff's—customers. (SDSA § 4.5.)

Under § 11.1 of the Agreement, Defendant agreed to "indemnify, defend and hold [Plaintiff] . . . harmless from and against any and all claims, liabilities and causes of action directly arising from or in any way connected with the Products as a result of [Defendant's] breach of any representation or warranty contained in [the] Agreement or [Defendant's] negligence or willful misconduct . . ." (PSAC ¶ 62 (quoting SDSA § 11.1).) The relevant warranties were found within

---

[3] As in its Opinion that Plaintiff seeks to have the Court reconsider, the Court cites to the Proposed Second Amended Complaint ("PSAC"), (ECF No. 33-2), because the Court based its analysis of Defendant's Motion for Judgment on the Pleadings on the PSAC to determine if Plaintiff's "proposed amendments would be futile." *Cherry Hill Partners at Vill. Place, L.L.C. v. Wachovia Bank, Nat. Ass'n*, No. 10-4770, 2011 WL 2610171, at *1 n.1 (D.N.J. June 30, 2011).

§10.1 and §10.2 of the Agreement. Defendant warrantied, pursuant to § 10.1 of the Agreement, that it would not "manufacture [], repackage, s[ell] or ship [] in violation of any applicable federal, state or local law, rule, regulation or ordinance in any material respect." (*Id.* ¶ 49 (quoting SDSA § 10.1).) Further, under § 10.2 of the Agreement, Defendant warrantied it would "comply with all applicable federal, state or local laws governing the manufacture, purchase, handling, sale, distribution, and price reporting of Products purchased under [the] Agreement." (*Id.* ¶ 50 (quoting SDSA § 10.2).)

After purchasing Products from Defendant at the end of March 2020, Plaintiff sold $2,622,000.00 of hydroxychloroquine to the State of Oklahoma—alleged to be Plaintiff's, not Defendant's, customer—at $218.50/unit. (*Id.* ¶¶ 88, 90.) At the time, Defendant's wholesale acquisition cost for hydroxychloroquine was allegedly $219.91/unit. (*Id.* ¶ 89.) Thereafter, the State of Oklahoma claimed Plaintiff's resale price violated the Oklahoma Emergency Price Stabilization Act and the Oklahoma Consumer Protection Act. (*Id.* ¶ 91.) Plaintiff alleged that, "[b]ecause the State of Oklahoma's accusations related solely to the legality of the price . . . and because [Plaintiff] did not have a history of distributing these Products," (*id.* ¶ 94), Plaintiff provided notice to Defendant of the State of Oklahoma's claims and "provided continuous updates and requests for [Defendant] to participate in the negotiations to settle with the State of Oklahoma." (*Id.*) Defendant allegedly "refused to participate or provide guidance in addressing the claims asserted by the State of Oklahoma." (*Id.* ¶ 95.) Plaintiff and the State of Oklahoma ultimately entered into a Mutual Settlement Agreement on April 27, 2021 whereby Plaintiff refunded the State of Oklahoma the purchase price of the hydroxychloroquine. (*Id.* ¶¶ 96–97.) Plaintiff then demanded indemnification from Defendant in relation to the Mutual Settlement Agreement, (*id.* ¶ 118), but Defendant allegedly "refused to respond to those demands" in breach of the Agreement. (*Id.* ¶ 119.)

After other purported breaches of the Agreement occurred, Plaintiff filed the instant suit on October 2, 2023. (ECF No. 1.) Plaintiff alleged two counts of breach of contract, one count of fraud, and one count of misrepresentation. (*See id.* at 19–31.) Count I of the Complaint specifically alleged that Defendant breached the Agreement "by failing to defend and indemnify" Plaintiff pursuant to its settlement with the State of Oklahoma. (*Id.* ¶ 100.) After a failed mediation, (ECF No. 20), Plaintiff filed its First Amended Complaint, which included the same four counts as the initial Complaint, but added an additional breach of contract count. (ECF No. 24 at 18–30.) After Defendant answered the First Amended Complaint,[4] Defendant filed a Motion for Judgment on the Pleadings on all counts, (ECF No. 31), and Plaintiff cross-moved for leave to file a Second Amended Complaint, (ECF No. 33).

On December 4, 2024, the Court granted in part and denied in part both Defendant's Motion for Judgment on the Pleadings and Plaintiff's Cross-Motion for Leave to Amend. (ECF Nos. 50, 51.) The Court granted Defendant's Motion for Judgment on the Pleadings and dismissed with prejudice Plaintiff's claims for fraud and misrepresentation, as well as Count I of the First Amended Complaint, which was Plaintiff's breach of contract claim for indemnification. (*See* ECF No. 51.) The Court denied Defendant's Motion in all other respects and granted Plaintiff leave to amend its First Amended Complaint with respect to the remaining two breach of contract counts. (*Id.*) With respect to its dismissal of Count I of the First Amended Complaint, the Court found that Plaintiff did not allege any facts supporting that Defendant breached any representation or warranty pursuant to the Agreement because the representations and warranties applied to Defendant's direct sales to Plaintiff—not Plaintiff's downstream resales to Plaintiff's own customers. (*See* Opinion at 14–16.) Consequently, Defendant was not obligated to indemnify

---

[4] Defendant also brought two counterclaims for breach of contract and account stated. (ECF No. 25.)

Plaintiff in connection with its allegedly improper resale of Products to the State of Oklahoma. (*Id.*)

Two weeks after the Court issued its Opinion, Plaintiff filed the instant Motion for Reconsideration, arguing that "the Court erred in dismissing [Plaintiff's] claim for contractual indemnification with prejudice." ("Motion," ECF No. 52-1.) Defendant opposed the Motion, ("Opp. Br.," ECF No. 55), and Plaintiff filed a reply ("Reply Br.," ECF No. 61).

## II.     LEGAL STANDARD

Reconsideration is an "extraordinary remedy" to be granted "sparingly." *United States v. Coburn*, No. 19-120, 2022 WL 874458, at *2 (D.N.J. Mar. 23, 2022) (quoting *NL Indus. Inc. v. Com. Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996)). "The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). To succeed on a motion for reconsideration, a movant must show "(1) an intervening change in the controlling law; (2) new evidence that was not available when the court issued its order, or (3) the need to correct a clear error of law or prevent manifest injustice." *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 190 (3d Cir. 2021) (citing *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)).

Pursuant to Local Civil Rule 7.1(i), a party may move for reconsideration within fourteen (14) days of an entry of order or judgment on the original motion. In its brief, the party must "set[] forth concisely the matter or controlling decisions which the party believes the Judge has overlooked." *See* L. Civ. R. 7.1(i). "The word 'overlooked' is the operative term in the Rule." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 130 F. Supp. 2d 610, 612 (D.N.J. 2001) (citing Allyn Z. Lite, *New Jersey Federal Practice Rules* 30 (2001)). A motion for reconsideration does not entitle

a party to a second bite at the apple, and reconsideration is inappropriate when a party merely disagrees with a court's ruling or when a party simply wishes to re-argue its original motion. *Sch. Specialty, Inc. v. Ferrentino*, No. 14-4507, 2015 WL 4602995, *2–3 (D.N.J. July 30, 2015); *see also Florham Park Chevron, Inc. v. Chevron U.S.A.*, 680 F. Supp. 159, 162 (D.N.J. 1988).

### III. DISCUSSION

The foundation of Plaintiff's Motion is that industry standards should override the plain language of a contract—an obviously incorrect proposition of law. Plaintiff does not bring its Motion on the basis of "an intervening change in the controlling law," or "new evidence that was not available when the court issued its order." *See Gibson*, 994 F.3d at 190. Rather, Plaintiff is explicit that its Motion "hinge[s] on overlooked factual matters." (Reply Br. at 1–2.) Specifically, Plaintiff argues that the Court overlooked the effect of Defendant's wholesale acquisition cost ("WAC") on Plaintiff's resale price to the State of Oklahoma. A WAC is:

> [T]he manufacturer's list price for the prescription drug or biological product to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological product pricing data.

42 C.F.R. § 403.1201(d). Plaintiff alleges that the WAC is "widely recognized as the industry standard, [and] sets a benchmark price relied upon by distributors (i.e., Plaintiff) and purchasing entities (i.e., the State of Oklahoma)." (Motion at 2.) As previously mentioned, Defendant's WAC at the time of Plaintiff's sale to the State of Oklahoma was allegedly $219.91/unit, (PSAC ¶ 89), and Plaintiff's resale price to the State of Oklahoma was $218.50/unit. (*Id.* ¶ 90.)

Plaintiff previously argued that, because Plaintiff's resale price—which was allegedly lower than Defendant's WAC—purportedly violated Oklahoma law, Defendant's WAC also necessarily violated Oklahoma law, and therefore, Defendant breached its representations and warranties within the Agreement, which entitles Plaintiff to indemnification. (*See* PSAC ¶ 129.)

6

However, in its Opinion, the Court found that "the plain language of the Agreement is clear that Defendant's representations and warranties apply to Defendant's sales of the Products 'to Plaintiff.' § 10.1 and § 10.2 of the Agreement are silent with respect to Plaintiff's downstream resales to its own customers."[5] (Opinion at 14.) The Court determined that while Plaintiff alleged it was required "to use [Defendant's] contract price to resell the Products *in the event [Defendant] had an agreement with the customer*," (ECF No. 33-1 (emphasis added); *see* SDSA § 4.5), there were no allegations that Defendant had a customer agreement with the State of Oklahoma—that customer was Plaintiff's alone. (Opinion at 14.) The Court elaborated as follows:

> Plaintiff is not alleging any facts that would implicate § 10.1 and § 10.2 of the Agreement. For example, Plaintiff does not allege that the sale of Products *from* Defendant *to* Plaintiff violated "any applicable federal, state or local law, rule, regulation or ordinance." (*See* SDSA § 10.1.) Indeed, other provisions of the Agreement make clear that it was actually *Plaintiff's* obligation to "comply with all laws governing its business related to the sale or distribution of the Products," (*id.* § 2.1), and that once Defendant delivered Products to Plaintiff, it was *Plaintiff* that retained title over the Products. (SDSA § 4.9.)

(*Id.*)

Plaintiff reiterates in its Motion that, because Defendant's representations and warranties within the Agreement apply to its disclosure of its WAC and Plaintiff relied on Defendant's WAC in setting its resale price slightly lower than Defendant's then-WAC, the State of Oklahoma's claims were essentially "rooted in the inflated benchmark that Defendant itself set." (Motion at

---

[5] Plaintiff takes issue with this finding by the Court, arguing that the Court overlooked allegations in the PSAC that explained, among other things, that (i) Defendant set the WAC, (ii) Defendant represented its WAC was established "in a legal manner," (iii) Defendant's representations and warranties included the legality of its WAC, (iv) violation of same entitled Plaintiff to indemnification, (v) the State of Oklahoma's "claims of price gouging directly arose from the WAC that Defendant established," and (vi) the State of Oklahoma claimed that the price it paid—which was based on Defendant's WAC—was "illegal." (Reply Br. at 3–4.) However, at most, these allegations amount to an inference that Defendant's WAC *affected* Plaintiff's resale pricing. Indeed, none of these allegations are relevant to the Court's finding that § 10.1 and § 10.2 of the Agreement are silent with respect to Plaintiff's downstream resales to its own customers. To be sure, Plaintiff's invocation of the WAC is based on industry standards and customs, not explicit terms in the Agreement.

13.) Thus, indemnification was required because "Defendant warranted that it would not engage in unlawful conduct and that it would comply with all applicable laws." (*Id.*)

However, even assuming Defendant's representations regarding its WAC fell within the scope of § 10.1 and § 10.2 of the Agreement, both provisions require Defendant's representations to conform with "*applicable* federal, state or local rule, regulation or ordinance," (SDSA § 10.1 (emphasis added)), and "*applicable* federal, state or local laws," (*id.* § 10.2 (emphasis added)). There are no allegations or provisions in the Agreement to support a finding that Oklahoma law is the "applicable" law for sales between Plaintiff (a California-incorporated drug supplier with a principal place of business in California) and Defendant (a Delaware-incorporated drug manufacturer with a principal place of business in New Jersey). (*See* PSAC ¶¶ 1–2; *see also* Opinion at 15 ("Plaintiff's self-described and uncontested status as a sophisticated business belies its purported blind-faith reliance on a wholesale price set by Defendant—a Delaware corporation with a principal place of business in New Jersey—as a legally-permissible price for a resale to the State of Oklahoma").) It would defy logic to find that Defendant was required to represent that its WAC complied with all possible laws in this country regarding pricing, particularly where it appears Defendant neither received any notice of Plaintiff's downstream resales ahead of time nor explicitly set Plaintiff's resale prices. (*See* Opp. Br. at 14 ("[Plaintiff]'s conception of the indemnity provision in the [] Agreement is breathtakingly broad—effectively having [Defendant] warrant the lawfulness of anything [Plaintiff] might consider in the future in setting a price to a later customer in an undisclosed jurisdiction.").)

Further, Plaintiff argues that "the factual and legally well-established fact that a manufacturer's set WAC pricing affects the downstream pricing of a pharmaceutical product[] was overlooked in error by the Court." (Motion at 14.) In fact, the Court *did* address Plaintiff's arguments regarding Defendant's WAC in its Opinion:

8

> Plaintiff also attempts to argue that it is "standard in the industry" for suppliers to rely on manufacturers' wholesale prices in setting their resale prices. [] However, even if this were true, it does not alter the executed Agreement, which does not contain an explicit representation or warranty by Defendant regarding Plaintiff's resale pricing. *See Carolina Beverage Corp. v. FIJI Water Co., LLC*, 102 Cal. App. 5th 977,991 (Cal. Ct. App. 2024) (citing *Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 790 (Cal. 1955)) (noting "industry standards cannot be used to rewrite a contract").

(Opinion at 15 n.10.) Indeed, Plaintiff's own Motion repeatedly refers to the WAC as a "benchmark price" and "pricing benchmark," (Motion at 2, 4, 13), and goes so far as to admit, "Defendant set the WAC for the Products, and *per industry standard*, Plaintiff and purchasing entities base their transactions, and rely on that published price in subsequent pricing decisions." (*Id.* at 2 (emphasis added).) Plaintiff conflates its reliance on Defendant's WAC as per industry standard with a contractually-required price. As the Court reasoned, "[t]here are [] no allegations nor evidence suggesting Defendant explicitly advised or guided Plaintiff's decisions as how to price its resales." (Opinion at 15.) While Plaintiff may have "depend[ed]" on Defendant's WAC in setting its resale pricing to the State of Oklahoma, (Motion at 13), the Court reiterates that the Agreement does not explicitly require Plaintiff to resell Products at—or even near—Defendant's WAC, or explicitly state that Plaintiff should use Defendant's WAC as a guidepost. While the Court does not doubt Plaintiff's assertion that the WAC is used as a benchmark for pricing in the pharmaceutical industry, nowhere in the Agreement is it explicitly required, and, thus, Plaintiff's claim for indemnification fails.

Moreover, for the first time in its Motion, Plaintiff cites cases in support of the argument that "[i]t has been well stated, including within this District, that the WAC—exclusively calculated and published by the manufacturer—forms a downstream representation as to the actual and fair

9

market value of the pharmaceutical product."[6] (Motion at 9.) Plaintiff takes what are essentially examples of courts summarizing factual allegations and frames them as findings of fact and conclusions of law. For example, Plaintiff argues that a court in this District "explained the chain of distribution of a pharmaceutical product and the downstream impact of the manufacturer's published WAC," quoting a section of the opinion that describes allegations in the pleadings, not the court's findings. *MSP Recovery Claims, Series LLC v. Abbott Lab'ys*, No. 19-21607, 2021 WL 2177548, at *3 (D.N.J. May 28, 2021) (citing paragraphs of plaintiff's complaint regarding WAC allegations); *see Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, No. 18-14999, 2020 WL 2394155, at *2 (D.N.J. Mar. 31, 2020) (same), *In re Insulin Pricing Litig.*, No. 17-00699, 2024 WL 416500, at *3 (D.N.J. Feb. 5, 2024) (same). None of these cited cases stand for the proposition that in the absence of explicit contractual language, the WAC alone can trigger an indemnification obligation to a business that resells a product to its own third-party customer at an independently-negotiated price.

Notwithstanding Plaintiff's restated arguments that this Court has overlooked the significance of Defendant's WAC, Plaintiff cannot fit a round peg into a square hole—the Agreement does not contain any explicit representations or warranties by Defendant in relation to Plaintiff's contemplated resale pricing. Thus, Defendant was not obligated to indemnify Plaintiff for its resale to the State of Oklahoma at a price that—while perhaps dependent on Defendant's WAC as per industry standard—was not contractually required to be at or near Defendant's WAC.

---

[6] Beyond the fact that this argument still does not change the plain language and scope of the Agreement, the Court observes that all these cases were available to Plaintiff at the time that it responded to Defendant's Motion for Judgment on the Pleadings. (*See* ECF No. 33.) Thus, it would be improper for the Court to consider them for the first time at the reconsideration stage. *See Kedia v. Jamal*, No. 06-6054, 2007 WL 1959266, at *3 (D.N.J. July 5, 2007) ("The Court could not have 'overlooked' the cases Defendants cite to in their Motion for Reconsideration within the meaning of Rule 7.1(i) because the parties did not mention these in their moving papers").

To the extent that Defendant warrantied the legality of its WAC, the Agreement is clear that the representation would only extend to Defendant's sales to Plaintiff. (*See* SDSA §§ 10.1, 10.2.) There is nothing explicit in the Agreement regarding Plaintiff's downstream resales. The Court's prior ruling was correct and Plaintiff's Motion for Reconsideration is without merit.[7]

Therefore, **IT IS** on this 10th day of March, 2025, **ORDERED** that:

1. Plaintiff's Motion for Reconsideration (ECF No. 52) is **DENIED**; and
2. The Clerk of the Court is directed to **TERMINATE** the motion pending at ECF No. 52.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

---

[7] Plaintiff also argues that this Court's dismissal with prejudice of Count I was an "extreme" ruling and that Plaintiff should have been permitted to "amend its complaint with respect to this Count." (Motion at 14.) However, in deciding both Defendant's Motion for Judgment on the Pleadings and Plaintiff's request for leave to amend, the Court considered Plaintiff's Proposed Second Amended Complaint and determined that amendment would be futile based on the allegations therein. (*See* Opinion at 16.) There would have been no basis for the Court to permit Plaintiff to amend when it already determined that the allegations in the proposed amendment were insufficient to sustain a claim with respect to Count I.